## UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | |
|---|---|
| DAVID G. RAY, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>                    Plaintiff,<br><br>TIERONE CORPORATION, GILBERT G. LUNDSTROM, EUGENE B. WITKOWICZ, MICHAEL J. FALBO, AND CHARLES W. HOSKINS,<br><br><br>                    Defendants. | Civil Action No.<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff David G. Ray, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint the following upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by TierOne Corporation ("TierOne" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) information readily obtainable on the Internet; and (e) interviews of several witnesses with personal knowledge of the relevant facts.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to defendants or are exclusively within their control.

1

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than defendants, who purchased the securities of TierOne between August 8, 2008 and May 14, 2010, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of federal securities laws (the "Class").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

5.     In connection with the acts, conduct and other wrongs alleged herein, defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff David G. Ray purchased TierOne common stock during the Class Period as set forth in his certification, filed herewith, and has suffered damages as a result.

7.     Defendant TierOne is a Wisconsin corporation with it principal executive offices located at 1235 N Street, Lincoln, Nebraska 68508.  TierOne is the parent holding company for

TierOne Bank (the "Bank").  The Bank is a federally chartered savings bank that offers full-service customer, commercial and agricultural banking products and services through a network of banking offices across Nebraska, Iowa and Kansas.  At all relevant times herein, the Company's common stock was traded on the NASDAQ under ticker "TONE."   On May 7, 2010 in connection with ongoing delisting proceedings by NASDAQ, the Company's stock began trading over-the-counter on the "Pink Sheets" under the same ticker.

8.     Defendant Gilbert G. Lundstrom ("Lundstrom"), at all relevant times herein, was the Company's and Bank's Chairman of the Board, Chief Executive Officer until he resigned those positions in January 2010.  Following his resignation, he remained with the Company as Vice Chairman.  In March of 2010, Lundstrom resigned as Vice Chairman.

9.     Defendant Michael J. Falbo ("Falbo") was the Company's and Bank's Chairman of the Board, Chief Executive Officer of the Company and the Bank from January 2010 to March 2010--when he abruptly resigned.

10.     Defendant Eugene B. Witkowicz ("Witkowicz"), at all relevant times herein, was the Company's Chief Financial Officer, Executive Vice President, Corporate Secretary, and Treasurer. Witkowicz also served as the Bank's Executive Vice President, Corporate Secretary, Treasurer and Director of Finance.

11.     Defendant Charles W. Hoskins ("Hoskins"), at all relevant times herein, was the Company's Lead Director and Chairman of the Company's Audit Committee.  In March of 2010, Hoskins was named as the Company's and Bank's acting Chairman of the Board.

12.     Lundstrom, Falbo, Witkowicz, and Hoskins are collectively referred to hereinafter as the "Individual Defendants."

13.     Each of the Individual Defendants:

3

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(f)     approved or ratified these statements in violation of the federal securities laws.

14.     As officers, directors and controlling persons of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Securities Act and Exchange Act, and was traded on the NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and to correct any previously-issued statements that had become materially misleading or untrue to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

15.     TierOne is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

16.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to TierOne under *respondeat superior* and agency principles.

4

## SUBSTANTIVE ALLEGATIONS

17.     The Class Period begins August 8, 2008 when the Company filed with the SEC a

materially false quarterly report for the second quarter ended June 30, 2008 on Form 10-Q.  The 10-

Q was signed by defendants Lundstrom and Witkowicz.  The 10-Q falsely stated that the Company's

internal controls were "effective."  The 10-Q states in relevant part:

> Our management evaluated, with the participation of our Chief Executive Officer
> and Chief Financial Officer, the effectiveness of the design and operation of our
> disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) under
> the Securities Exchange Act of 1934) as of the end of the period covered by this
> report. Based on such evaluation, our Chief Executive Officer and Chief Financial
> Officer have concluded that our disclosure controls and procedures were effective as
> of the date of such evaluation to ensure that material information relating to us,
> including our consolidated subsidiaries, was made known to them in a timely manner
> by others within those entities, particularly during the period in which this report was
> being prepared. There was no change in our internal control over financial reporting
> that occurred during the period covered by this report that has materially affected, or
> is reasonably likely to materially affect, our internal control over financial reporting.

18.     Attached to the 10-Q were separately signed Sarbanes-Oxley Act of 2002 ("SOX")

certifications of defendants Witkowicz and Lundstrom.  Both Witkowicz and Lundstrom falsely

certified: (1) that the Company's financial statements were accurate; (2)   that the financial

statements did not omit to state a material fact, and that any fraud, whether or not material that

involved management or other employees who have a significant role in the registrant's internal

control over financial reporting was disclosed to the Company's auditors; (3) that they disclosed to

the Company's auditor, KPMG, LLP, and the to the Company's Audit Committee, "all significant

deficiencies and material weaknesses in the design or operation of internal control over financial

reporting which are reasonably likely to adversely affect the registrant's ability to record, process,

summarize and report financial information; and Any fraud, whether or not material, that involves

management or other employees who have a significant role in the registrant's internal controls over financial reporting."

19.     On November 10, 2008 the Company filed with the SEC a materially false quarterly report for the third quarter ended September 30, 2008 on Form 10-Q. The 10-Q falsely stated that the Company's internal controls were "effective" as it did for the Company's Q2 2008 10-Q. Attached the 10-Q were materially false SOX certifications separately signed by Witkowicz and Lundstrom, that were, in sum and substance, identical to their SOX certifications issued at the beginning of the Class Period.

20.     On January 15, 2009, the Company filed an 8-K with the SEC announcing an adverse regulatory action taken against the Bank. The 8-K states that the Bank had entered into a Supervisory Agreement with the Office of Thrift Supervision ("OTS"). The announcement states in relevant part:

> On January 15, 2009, TierOne Bank ("Bank"), the wholly owned subsidiary of TierOne Corporation ("Company"), entered into a supervisory agreement with the Office of Thrift Supervision ("OTS"), the Bank's primary federal regulator, in response to regulatory concerns raised in the Bank's most recent regulatory examination by the OTS and to address the current economic environment facing the banking and financial industry.

> The agreement requires, among other things, (A) the review, and where appropriate, revisions to (i) loan policies, procedures and reporting; (ii) credit administration and underwriting; (iii) asset classification; (iv) allowance for loan and lease loss analysis; and (v) internal asset review; (B) enhanced management oversight including restrictions on changes in compensation arrangements; and (C) strengthening the Bank's capital position, including a requirement that the Bank maintain a minimum core capital ratio of 8.5% and a minimum total risk-based capital ratio of 11.0%. At September 30, 2008, the Bank's core and risk-based capital ratios were 9.0% and 11.4%, respectively, both in excess of the higher required levels prior to taking into account a $10.0 million capital contribution made by the Company to the Bank in October 2008. As recently reported, the Company made capital contributions to the Bank totaling $29.1 million during the first ten months of 2008. The supervisory agreement also prohibits capital distributions by the Bank and the acceptance of brokered deposits. The Company agreed to maintain the Bank's regulatory capital (at

6

the levels described above) as well as to not pay dividends on its common stock, make payments on its trust preferred securities and repurchase any shares of its common stock until OTS issues its written notice of non-objection. The supervisory agreement will remain in effect until modified, suspended or terminated by the OTS.

21.     This adverse information caused the Company's stock to fall on January 16, 2009 from a prior closing price $3.38 per share to $2.10 share, or 38%.

22.     However, this 8-K, which is signed by Lundstrom, falsely reassured investors that the Company's Board and "senior management" were committed to resolving and addressing the issues set forth in the supervisory agreement.  The 8-K states in relevant part:

> The Board of Directors and senior management of the Company and the Bank are committed to thoroughly and expeditiously addressing and resolving all issues raised in the supervisory agreement on a timely basis. The Bank has already fulfilled many of the obligations set forth in the supervisory agreement and is in the process of undertaking several actions to comply with the remaining requirements imposed by the supervisory agreement. Compliance with the supervisory agreement is not expected to have a material adverse effect on the Company's or the Bank's business or operations.

23.     On February 23, 2009 the Company issued a materially false and misleading press release announcing its financial results for the fourth quarter and fiscal year ended December 31, 2008.  The financial information in the press release were materially false and misleading because the Company failed to properly account for its loan loss provision and reserves.

24.     On March 12, 2009 the Company filed with the SEC its annual report for the fiscal year ended December 31, 2008 on Form 10-K.  The 10-K was signed by defendants Lundstrom, Witkowicz, and Hoskins.  The financial statements contained in the 10-K were materially false and misleading because the Company improperly accounted for its loan loss reserves and provision.

25.     The 10-K also falsely states that the Company's internal controls were effective.  The 10-K states in relevant part:

Our management has evaluated, with the participation of our Chief Executive Officer and Chief Financial Officer the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of the date of such evaluation to ensure that material information relating to us, including our consolidated subsidiaries, was made known to them by others within those entities, particularly during the period in which this report was being prepared. There was no change in our internal control over financial reporting that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

\* \* \*

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, an evaluation was conducted of the effectiveness of our internal control over financial reporting as of December 31, 2008 using the criteria set forth in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, our management believes that, as of December 31, 2008, our internal control over financial reporting was effective based on those criteria.

26.     Attached to the 10-K were false SOX certifications signed by Lundstrom and Witkowicz, that in sum and substance were nearly identical to the SOX certifications noted above.

27.     On May 5, 2009 the Company issued a materially false press release announcing its results for the first quarter ended March 31, 2009. The press release and the financial information contained therein was materially false and misleading because the Company failed to properly account for its loan loss reserves and provision.

28.     On May 8, 2009 the Company filed with the SEC its quarterly report for the first quarter of 2009. The 10-Q, signed by defendants Lundstrom and Witkowicz, was materially false and misleading because the Company failed to properly account for its loan loss reserves and provision. The 10-Q also falsely stated that the Company's internal controls were effective. The 10-Q states in relevant part:

> Our management evaluated, with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of the date of such evaluation to ensure that material information relating to us, including our consolidated subsidiaries, was made known to them in a timely manner by others within those entities, particularly during the period in which this report was being prepared. There was no change in our internal control over financial reporting that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

29.     Attached to the 10-Q were false SOX certifications signed by Lundstrom and Witkowicz, that in sum and substance were nearly identical to the SOX certifications noted above.

30.     On August 7, 2009 the Company issued a materially false press release announcing its results for the second quarter ended June 30, 2009.  The press release was false because the company failed to properly account for loan loss reserves and provision in the financial information contained in the press release.

31.     On August 10, 2009, the Company filed with the SEC its quarterly report for the second quarter of 2009.  The 10-Q, signed by Defendants Lundstrom and Witkowicz, was materially false and misleading because the Company failed to properly account for its loan loss reserves and provision.  The 10-Q also falsely stated that the Company's internal controls were effective.  The 10-Q states in relevant part:

> Our management evaluated, with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of the date of such evaluation to ensure that material information relating to us, including our consolidated subsidiaries, was made known to them in a timely manner by others within those entities, particularly during the period in which this report was being prepared. There was no change in our internal control over financial reporting

9

that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

32.     Attached to the 10-Q were false SOX certifications signed by Lundstrom and Witkowicz, that in sum and substance were nearly identical to the SOX certifications noted above.

33.     On September 4, 2009, the Company issued a press release announcing that it had entered into a definitive agreement to sell certain deposits and loans associated with 32 of the Bank's branches to Great Western Bank, a subsidiary of National Australia Bank.  The press release states that the closing of transaction was contingent on "regulatory approval."  The press release states in relevant part:

September 4, 2009
Edward J. Swotek, Senior Vice President
Immediately
**TierOne To Sell Omaha and Other Selected Bank Offices**
***Move Returns TierOne Bank to Historic Community Bank Footprint; Expected to Increase Capital Position***

LINCOLN, NE – September 4, 2009 - TierOne Corporation (NASDAQ: TONE) ("Company"), the holding company for TierOne Bank ("Bank"), announced today the Company and the Bank have entered into a definitive agreement ("Agreement") to sell deposits, selected loans and other assets associated with 32 of the Bank's branch offices to Great Western Bank, a South Dakota-based subsidiary of National Australia Bank.  The transaction, which is subject to regulatory approval and other customary closing conditions, is expected to be completed as soon as late 2009.

Under the terms of the Agreement, Great Western Bank will assume approximately $1.1 billion in deposits.  The Bank will transfer or sell to Great Western Bank approximately  $800.0 million in loans, $20.0 million in real estate and other assets and the balance in cash or securities less a $55.0 million deposit premium paid.

The branch offices involved in the transaction are located in Broken Bow, Burwell, Callaway, Columbus (2), Gothenburg, Grand Island (2), Holdrege (2), Lexington (3), McCook, North Platte (2), O'Neill, Omaha (9), Ord, Papillion and St. Paul, Nebraska and three offices located in Council Bluffs, Iowa.  Many of the branch offices being sold were acquired by the Company in its 2004 acquisition of United Nebraska Bank. The remaining branches consist of other facilities the Bank has built or acquired.

34.      Commenting on the transaction, defendant Lundstrom is quoted as follows:

"After the branch office sale, TierOne Bank will return to its historic community bank footprint and will enhance its capital position," said Gilbert G. Lundstrom, chairman and chief executive officer.  "Completion of the transaction will fortify the Bank's capital levels.  This additional capital will strengthen our ability to continue to address selected asset quality issues and improve our capacity to manage through this challenging economic period.  As we have in the past, we will continue to evaluate our loan portfolio and take necessary action to manage our balance sheet."

35.      This announcement caused the Company's stock to rise on September 4, 2009 from a previous closing price $2.16 per share to $3.13—a 45% increase.

36.      On October 14, 2009 the Company filed an 8-K with the SEC announcing that its prior financial statements for the three and six months ended June 30, 2009 should no longer be relied upon and had to be restated in light of the OTS directing the Company to the record additional loan loss provisions for the quarter ended June 30, 2009.  The 8-K states in relevant part:

Item 2.06.
        Material Impairments.

TierOne Corporation ("Company") is the holding company for TierOne Bank ("Bank").  In connection with an examination of the Bank which commenced after the Company filed its second quarter 2009 Form 10-Q, the Office of Thrift Supervision ("OTS"), the Bank's primary regulator, directed the Bank to establish additional loan loss provisions for the quarter ended June 30, 2009 because of differences of opinion and the timeliness of credit information used in estimating the fair value assessment of collateral on five individual credits.  As a result of the OTS examination, the Bank also was directed to effect, retroactive to June 30, 2009, certain loan grading changes.  In particular, the OTS directed the Bank to reclassify $82.3 million in loans previously designated as "special mention" into adverse classifications.

In light of the foregoing, on October 13, 2009, the Company's Audit Committee, in consultation with the Company's management and independent registered public accountants, determined that the Company will record an additional loan loss provision of approximately $13.9 million (which includes a total charge-off of approximately $10.6 million) for the three months ended June 30, 2009 to reflect, as directed by the OTS, an adjustment to its allowance for loan losses as of June 30, 2009.  As noted in Item 4.02 below, the Company intends to file an amended Form 10-Q for the quarter ended June 30, 2009 (including restated financial statements) as

soon as practicable to reflect the effects of the above-referenced charge-offs, loan grading changes and increase in the allowance for loan losses.

The Bank is currently subject to a supervisory agreement that it entered into with the OTS on January 15, 2009.  Among other things, the supervisory agreement requires the Bank to maintain enhanced minimum capital requirements in excess of those required of an institution deemed to be "well capitalized" by the OTS.  As a result of the above-referenced restatement, the Company expects that the Bank's minimum core capital ratio, as of June 30, 2009, will be adjusted to approximately 8.11%, which is below the elevated ratio of 8.50% required by the supervisory agreement (the regulatory core capital ratio normally required to be deemed "well capitalized" is 5.00%).  The Bank's total risk-based capital ratio, as of June 30, 2009, is expected to be adjusted to approximately 10.85%, which is below the 11.00% required by the supervisory agreement (the regulatory total risk-based capital ratio normally required to be deemed "well capitalized" is 10.00%).  The Bank's failure to comply with the supervisory agreement could result in, among other actions, the initiation of additional enforcement actions by the OTS.

 As part of the Bank's efforts to maintain enhanced minimum capital requirements pursuant to its supervisory agreement with the OTS, on September 4, 2009, the Company announced that the Company and the Bank had entered into a definitive agreement ("Agreement") to transfer deposits and sell selected loans and other assets associated with 32 of the Bank's branch offices to Great Western Bank, a South Dakota-based subsidiary of National Australia Bank.  The Bank believes the consummation of the transactions contemplated by the Agreement, which are subject to, among other conditions, the receipt of regulatory approval, will result in the Bank's capital position exceeding the enhanced OTS minimum capital requirements imposed by the supervisory agreement.  There can be no assurances, however, that the Bank will be in compliance with these enhanced minimum capital requirements upon consummation of the transactions contemplated by the Agreement due to unforeseen or intervening events nor can there be any assurance that the Agreement will receive all regulatory and other approvals and the transactions thereunder consummated.  The parties to the Agreement are seeking to consummate the transactions contemplated by the Agreement as early as late 2009 but there are no assurances that such schedule will be achieved.

The Bank continues to evaluate its loan portfolio as well as its loan loss reserves. Depending on future circumstances and events, additional loan loss provisions may be required for periods subsequent to June 30, 2009.

Item 4.02(a).
Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.

On October 13, 2009, as a result of the matters described in Item 2.06 hereof (which disclosure is incorporated herein by reference), the Audit Committee of the Company determined that the financial statements as of and for the three-month and six-month periods ended June 30, 2009 contained in the Quarterly Report on Form 10-Q filed by the Company on August 10, 2009 should not be relied upon. The Company plans to restate its financial statements for such periods and will present the restated financial statements in an amendment to its Quarterly Report on Form 10-Q for the quarter ended June 30, 2009 as soon as practicable. The Bank will likewise file an amended Thrift Financial Report for the period ended June 30, 2009.

The Audit Committee and the management of the Company and the Bank discussed the matters disclosed in this filing with the Company's independent registered public accountants.

37.     The October 14, 2009 8-K caused the Company's stock to fall from $3.27 on that day to $2.69 the next two trading days or—18%.

38.     On November 10, 2009 the Company filed an 8-K with the SEC providing for further increases to the Company's loan loss provision for the second quarter of 2009. The announcement states in relevant part:

Item 2.06.
Material Impairments.

TierOne Corporation (the "Company") is the holding company for TierOne Bank (the "Bank"). On a quarterly basis, the Bank is required to file Thrift Financial Reports ("TFRs") with the Office of Thrift Supervision (the "OTS"). The OTS is the Bank's primary regulator. The TFR requires the Bank to report various information, including financial statement and supplemental data regarding the Bank's performance and financial condition for and as of the quarter covered by the TFR.

On November 5, 2009, the Bank filed its TFR for the quarter ended September 30, 2009. The TFR reflected a loan loss provision of approximately $120.2 million (which includes a total charge-off of $109.8 million) for the three months ended September 30, 2009. The loan loss provision and the charge-offs for the third quarter reflect (i) the results of the ongoing OTS examination of the Bank; (ii) the receipt of recent, updated appraisals which show continued deterioration of property values in selected markets; (iii) aggressive steps undertaken by management to dispose of the Bank's problem assets; and (iv) management's subjective judgment as to continued deterioration in the Bank's loan portfolio resulting from ongoing economic challenges generally and, in particular, challenges in the real estate market.

13

In a Form 8-K filing dated October 13, 2009, the Company had previously disclosed that it would be restating its financial statements as of and for the three-month and six-month periods ended June 30, 2009. In the Form 8-K filing, the Company reported that it expected an additional loan loss provision of $13.9 million (including a total charge-off of $10.6 million) for the three months ended June 30, 2009. On November 5, 2009, the Bank filed an amended TFR for the quarter ended June 30, 2009 and reported an increase to $17.4 million (including a total charge-off of $14.1 million) in the additional loan loss provision for such quarter. The $3.3 million increase in the additional loan loss provision resulted from the further review of the Bank's loan portfolio that is being undertaken as the Company continues to prepare its restated financial statements for inclusion in an amended Form 10-Q for the quarter ended June 30, 2009.

The Bank is currently subject to a supervisory agreement that it entered into with the OTS on January 15, 2009. Among other things, the supervisory agreement requires the Bank to maintain enhanced minimum capital requirements in excess of those required of an institution deemed to be "well capitalized" by the OTS. As a result of the financial performance reported in the above-referenced TFRs, the Bank's minimum core capital ratio, as of June 30, 2009, was approximately 7.95%, which is below the elevated ratio of 8.50% required by the supervisory agreement (the regulatory core capital ratio normally required to be deemed "well capitalized" is 5.00%). The Bank's total risk-based capital ratio, as of June 30, 2009, was approximately 10.66%, which is below the 11.00% required by the supervisory agreement (the regulatory total risk-based capital ratio normally required to be deemed "well capitalized" is 10.00%). With the additional loan loss provisions discussed above, as of September 30, 2009, the Bank's core capital and total risk-based capital ratios were approximately 4.00% and 6.09%, respectively.

The Bank, as of September 30, 2009, is below both the enhanced capital requirements set forth in the supervisory agreement as well as the ratios normally required to be deemed "well capitalized" by the OTS. The Bank's total risk-based capital ratio of 6.09% as of September 30, 2009 results in the Bank being classified as "undercapitalized." As a result of being undercapitalized as of September 30, 2009, the Bank is required to submit a capital restoration plan and is subject to various additional restrictions provided by the terms of the Prompt Corrective Action regulations. It is possible that the OTS may take additional actions as a result of the Bank's capital status and the ongoing examination of the Bank by the OTS. The Company cannot currently predict what impact it may experience as a result of the actions that may be taken by the OTS.

As part of the Bank's efforts to increase its capital, as previously disclosed the Company and the Bank entered into a definitive agreement, dated September 3, 2009 (the "Agreement"), to transfer deposits and sell selected loans and other assets associated with 32 of the Bank's branch offices to Great Western Bank, a South Dakota-based subsidiary of National Australia Bank. The increased capital expected to result from the consummation of the transactions contemplated by the Agreement

(which Agreement is subject to, among other conditions, the receipt of regulatory approval), combined with a reduction in risk-based assets due to the sale, is expected to result in the Bank being deemed "adequately capitalized," but below the levels required to be "well capitalized" or to be in compliance with the supervisory agreement. In addition, there can be no assurances that the Bank will be at least "adequately capitalized" upon consummation of the transactions contemplated by the Agreement due to unforeseen or intervening events, including possible further regulatory actions as a result of the OTS examination, nor can there be any assurance that the Agreement will receive all necessary regulatory and other approvals in order to be able to consummate the transaction. The Bank is currently seeking to consummate the transactions contemplated by the Agreement in the first quarter of 2010 but there are no assurances that such schedule will be achieved. The closing of the transaction is subject to customary conditions precedent, including regulatory approval, several of which are beyond the Company's ability to control.

In addition, The Worker, Homeownership and Business Assistance Act of 2009, passed into law last week, contains a provision permitting companies to carryback 2008 or 2009 losses for five years and to obtain a refund of taxes previously paid. The Bank intends to carryback losses that are expected to result in a fourth quarter 2009 tax benefit to the Bank of approximately $26.5 million. However, the exact amount of the benefit is subject to adjustment and may be significantly less than this amount.

Item 8.01.      Other Events.

As previously reported, the Company is in the process of preparing an amended Form 10-Q for the quarter ended June 30, 2009. The amended Form 10-Q will include restated financial statement as of and for the three-month and six-month periods ended June 30, 2009. The restated financial statements are required because the OTS directed the Bank to establish additional loan loss provisions for the 2009 second quarter. The Company intends to file the amended Form 10-Q as soon as practicable after management has completed its reassessment of the Bank's loan portfolio. The delay in the preparation of the amended second quarter Form 10-Q has also resulted in a delay in filing of the Company's Form 10-Q for the quarter ended September 30, 2009, which filing was due on November 9, 2009. The Company is working diligently to file both the amended second quarter Form 10-Q and the third quarter Form 10-Q as promptly as possible. The Company will not, however, be able to make such filings within the five calendar day grace period potentially available pursuant to Rule 12b-25 under the Securities Exchange Act of 1934, as amended.

39.     The November 10, 2009 announcement caused the Company's to stock to fall on

November 11, 2009 from a prior closing price of $1.71 per share to $1.07 per share—or 37%.

40.     On November 13, 2009 the Company issued an announcement advising that it received a delayed filing notice from NASDAQ as a result of the Company's inability to timely file its 10-Q for the quarter ended September 30, 2009.   The announcement caused the Company's stock to fall on November 13, 2010 by $.16 per share or 17%.

41.     On March 31, 2010, the Company issued a press release announcing that it had entered into a Consent to Issuance of Prompt Corrective Action Directive with the OTS.   The announcement states in relevant part:

> TierOne Bank Executes Consent to Issuance of Prompt Corrective Action Directive with Federal Regulator; Announces Board and Management Changes
>
> LINCOLN, NE – March 30, 2010 - TierOne Corporation (NASDAQ: TONE) ("Company"), the holding company for TierOne Bank ("Bank"), announced today that the Bank has executed a Stipulation and Consent to a Prompt Corrective Action Directive ("PCA Directive") with the Office of Thrift Supervision ("OTS"), the Bank's primary federal regulator, setting forth certain required recapitalization mandates and additional business and operational restrictions.  The PCA Directive will become effective upon the acceptance of the Consent by the OTS and the issuance of the PCA Directive.
>
> Under the PCA Directive, among other things, the Bank will be required to be recapitalized prior to May 31, 2010, by either merging with or being acquired by another financial institution or by the sale of all or substantially all of the Bank's assets and liabilities to another financial institution. The PCA Directive further requires the Bank to submit a binding merger or acquisition agreement to the OTS by April 30, 2010, unless extended in writing by the OTS.  The Company and the Bank cannot provide assurance that the deadlines and other terms of the PCA Directive can be satisfied.  The Bank's consent to the PCA Directive follows the OTS' denial of the Bank's capital restoration plan.
>
> The Company and the Bank also announced today that Charles W. Hoskins has been named acting Chairman of the Board and James A. Laphen has been named President and acting Chief Executive Officer of the Company and the Bank effective immediately. Hoskins, 73, has been serving as the Company's lead director.  Laphen, 61, had previously been President and Chief Operating Officer of the Company and the Bank.
>
> The appointments of Hoskins and Laphen follow the resignation of Michael J. Falbo as Chairman and Chief Executive Officer and as a director of the Company and the

16

Bank.  Samuel P. Baird, Gilbert G. Lundstrom, James E. McClurg and James W. Strand also resigned from the Board of Directors of the Company and the Bank.  These resignations follow ongoing discussions with the OTS regarding the terms of the PCA Directive, particularly with respect to the deadlines for compliance set forth in the PCA Directive.  The directors who resigned did not indicate any disagreement with the Company or the Bank's operations, policies or practices.

Falbo was named Chairman and Chief Executive Officer on January 28, 2010.  Lundstrom, who was named Vice Chairman following his retirement as Chairman and Chief Executive Officer in January, has been with TierOne Bank since 1994.  Baird joined the Company's and the Bank's Boards in 2008 and both McClurg and Strand joined the Boards in July 2009.

42.    The announcement caused the Company's stock to fall by nearly 50% from a previous closing price of $.62 per share to $.32 per share.

43.    On April 25, 2010 the Company issued a press release announcing that its independent auditor, KPMG, LLP, resigned.  The announcement states in relevant part:

TierOne Corporation Reports Resignation of KPMG LLP as Its Auditors

LINCOLN, NE – April 25, 2010 - TierOne Corporation (NASDAQ: TONE) ("Company"), the holding company for TierOne Bank, today reported that KPMG LLP has orally submitted its resignation effective April 23, 2010 as the Company's independent auditors.  In addition, KPMG has orally informed the Company's Audit Committee that it has withdrawn its audit opinion and internal control assessment relating to the Company's financial statements at and for the year ended December 31, 2008 as well as its review of the Company's financial statements at and for the three months ended March 31, 2009.  KPMG has orally indicated to the Company that those financial statements contain material misstatements and should not be relied upon by investors. The Company's Audit Committee is reviewing the statements made by KPMG and intends to commence a search for new independent auditors.

44.    On April 29, 2010, the Company filed an 8-K providing further detail about KPMG's resignation.  The 8-K attempted to refute accusations that KPMG had lodged against the Company about its financial statements and internal controls.  The 8-K also revealed that KPMG had informed the Company that it had withdrawn its audit opinion relating to the Company's financial statements

at and for the year ended December 31, 2008 and KPMG's internal control assessment for that same

period.  KPMG also advised the Company's that Company's financial statements for the first and

second quarter of 2009 should not be relied upon and that the KPMG was withdrawing its review of

such financial statements.  The announcement states in relevant part:

> *Resignation of Independent Auditors*
>
> On April 23, 2010, TierOne Corporation  (the "Company") was advised orally by KPMG LLP ("KPMG"), the Company's independent registered public accounting firm, that KPMG was resigning from its position as the independent auditors of the Company and of the TierOne Bank Savings Plan, effective immediately.  The oral resignation was subsequently confirmed in writing.  A copy of the letters of resignation are attached to this Current Report on Form 8-K as Exhibit 99.1 and Exhibit 99.2.
>
> Prior to April 23, 2010, KPMG had not previously advised management or the Company's Audit Committee of its intention to resign its engagement as the Company's independent registered public accounting firm.  The resignation was not sought or recommended by the Company's Audit Committee.  The Audit Committee is in the process of commencing an immediate search for a new independent accountant.
>
> It is the Company's understanding that KPMG has resigned as a culmination of factors related to an examination by the Office of Thrift Supervision (OTS), TierOne Bank's primary regulator, which required the Company to reevaluate its loan loss provisions for the quarter ended June 30, 2009.  Specifically, on April 25, 2010, KPMG orally advised the Company (through the Company's Audit Committee) that KPMG requested on multiple occasions, and did not timely receive, a document estimating potential additional needs for specific reserves (the "document"), which was provided to the OTS and referenced in an OTS examination report, and that the Company allegedly asserted to the OTS, after the OTS had requested an additional copy of it, that the document had been destroyed.  KPMG further indicated that the document, and management's alleged actions related to it, lead KPMG to conclude that it is no longer able to rely on management's representations.
>
> Contrary to KPMG's position, the Company had previously provided the document to KPMG.  Moreover, the document was provided electronically to the OTS and was not destroyed by the Company.  The Company also notes that at no point did KPMG inform the Company's Audit Committee of the failure to receive the document, and that as recently as April 19, 2010, KPMG had affirmed (without absolute assurance ) that it believed it could be in a position to issue its audit opinion in time for the Company to file its Annual Report on Form 10-K for the year ended December 31,

2009, amended Form 10-Q for the quarter ended June 30, 2009 and Form 10-Q for the quarter ended September 30, 2009 by April 30, 2010.

*Reportable Events and Disagreements with the Independent Auditors*

The report of KPMG on the financial statements of the Company for the fiscal year ended December 31, 2008 contained no adverse opinions or disclaimer of opinion and was not qualified or modified as to uncertainty, audit scope or accounting principles (KPMG did not issue a report for the fiscal year ended December 31, 2009). For the fiscal years ended December 31, 2008 and December 31, 2009 and through the date of this report, there were no disagreements with KPMG on any matter of accounting principles or practices, financial statement disclosure or audit scope or procedure which, if not resolved to the satisfaction of KPMG, would have caused it to make reference to the subject matter of such disagreement in its reports on the financial statements for such fiscal years. Nor, except to the extent described below in this Form 8-K, were there any reportable events within the meaning of Item 304(a)(1)(v) of Regulation S-K for the fiscal years ended December 31, 2008 and December 31, 2009 and through the date of this report. In connection with KPMG's resignation, KPMG advised the Company orally that it had concluded that it is no longer able to rely on management's representations and that it was withdrawing its audit opinion relating to the Company's financial statements at and for the year ended December 31, 2008 contained in the Annual Report on Form 10-K filed by the Company on March 13, 2009 (the "2008 Form 10-K") because such financial statements contain material misstatements related to certain out of period adjustments for loan loss reserves; and that it was withdrawing its internal control assessment relating to the Company's financial statements at and for the year ended December 31, 2008 contained in the 2008 Form 10-K due to a material weakness in internal control over financial reporting related to the material misstatements.


Item 4.02.
Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.

Previous Reports on Financial Statements Disagreements with the Auditors

KPMG has advised the Company and the Company's Audit Committee orally that (1) it has withdrawn its audit opinion relating to the Company's financial statements at and for the year ended December 31, 2008 contained in the 2008 Form 10-K because such financial statements contain material misstatements related to certain out of period adjustments for loan loss reserves; and (2) that it has withdrawn its internal control assessment relating to the Company's financial statements at and for the year ended December 31, 2008 contained in the 2008 Form 10-K due to a material weakness in internal control over financial reporting related to the material misstatements. As a result, KPMG has advised the Company and the Company's

Audit Committee orally that these financial statements should no longer be relied upon. In addition, KPMG has advised the Company orally that the financial statements as of and for the three-month period ended March 31, 2009 contained in the Quarterly Report on Form 10-Q filed by the Company on May 8, 2009 should no longer be relied upon and that KPMG was withdrawing its review of such financial statements. As previously reported by the Company, the Audit Committee of the Company determined that the financial statements as of and for the three-month and six-month periods ended June 30, 2009 contained in the Quarterly Report on Form 10-Q filed by the Company on August 10, 2009 should not be relied upon.

Other Information

The Company is currently delinquent in the filing of its Form 10-Q for the fiscal quarter ended September 30, 2009 and its Form 10-K for the fiscal year ended December 31, 2009. As previously reported by the Company, these delinquencies have been caused by the Company's need to reevaluate its loan loss provisions for the quarter ended June 30, 2009, in response to an examination by the OTS.

The Company has provided KPMG a copy of this Form 8-K and requested KPMG to furnish a letter addressed to the Securities and Exchange Commission stating whether it agrees with the statements made in both Item 4.01 and this Item 4.02 of this Form 8-K, and, if not, stating the respects in which it does not agree. The Company has requested that KPMG provide such letter as soon as possible, so that the Company can file such letter as an Exhibit to this Current Report on an amended Form 8-K within the time period prescribed by the Securities and Exchange Commission.

The Company's Audit Committee has discussed the matters disclosed above with KPMG.

45.     On April 30, 2010, the Company issued a press release announcing that the proposed transaction with Great Western Bank to acquire assets from the Company was rejected by the OTS. Upon information and belief, the reason for the rejection was the Company's wholesale lack of internal controls and misstated financial statements. This announcement caused the Company's stock to fall 8.9% on April 30, 2010.

46.     On May 14, 2010, the Company filed a Form 8-K/A amending its 8-K filed with the SEC on April 29, 2010, to include KPMG's response letter dated May 12, 2010.

47.     KPMG's letter refutes the Company's 8-K and demonstrates that the Defendants attempted to conceal material accounting information from KPMG that impacted on the accuracy of the Company's previously reported financial statements and the Company's internal controls.  The letter states as follows:

May 12, 2010
Securities and Exchange Commission
Washington, DC  20549

Ladies and Gentlemen:

We were previously engaged as principal accountants for TierOne Corporation (the Company). On April 23, 2010, we resigned. We have read the Company's statements included under Items 4.01 and 4.02 of its Form 8-K dated April 29, 2010, and we agree with such statements, except for the following under Item 4.01:

I.      We are not in a position to agree or disagree with:
   a.   the Company's statement in the second paragraph that it is in the process of commencing an immediate search for a new independent accountant; and
   b.   the Company's statement in the fourth paragraph that a document estimating potential additional needs for specific reserves was provided electronically to the Office of Thrift Supervision (OTS).

II.     We do not agree with:
   a.   The Company's statement in the third paragraph that KPMG resigned as a culmination of factors related to an examination by the OTS, which required the Company to reevaluate its loan loss provisions for the quarter ended June 30, 2009.  While KPMG did describe a culmination of factors leading to its decision to resign, the factors were not limited to matters related to the OTS examination, and the Company's reference to a "document estimating potential additional needs for the specific reserves" is incomplete. KPMG told the Chair of the Company's Audit Committee that KPMG had learned of the existence of a document (the "document") showing an internal analysis of estimates of potential additional needs for specific reserves that appeared to have been created in the second quarter of 2009 and was told by a representative of the OTS that the document had been presented to the Company's Board of Directors during the second quarter of 2009. KPMG also told the Chair of the Company's Audit Committee that the document had not been produced timely to KPMG, nor had it been included in the Board of Director materials

provided to KPMG and that the Board of Director minutes did not include any reference of the presentation of the document or a discussion of it by the Board, and that management had represented to KPMG that all significant board and committee actions were included in the Board minutes provided to KPMG. KPMG told the Chair of the Company's Audit Committee that as a consequence KPMG believed it could not rely on prior representations by management, and was terminating its auditor relationship with the Company.

b.   The Company's statement in the fourth paragraph that it had previously provided the document estimating potential additional needs for specific reserves to KPMG. KPMG was provided an electronic download of information from the Company's counsel on December 8, 2009, and has performed an electronic search of such electronically-provided information and has been unable to locate the aforementioned document that it obtained from the Company on April 20, 2010.

c.   The Company's statement in the fourth paragraph that as recently as April 19, 2010, KPMG had affirmed (without absolute assurance) that it believed it could be in a position to issue its audit opinion in time for the Company to file its Annual Report on Form 10-K for the year ended December 31, 2009, amended Form 10-Q for the quarter ended June 30, 2009 and Form 10-Q for the quarter ended September 30, 2009 by April 30, 2010. KPMG on April 19, 2010 told the Audit Committee Chair and management that it was highly unlikely that KPMG would be in a position to complete its reviews of the quarterly financial information and its audit of the consolidated 2009 financial statements by April 30, 2010

Very truly yours,
/s/ KPMG LLP

## **NO SAFE HARBOR**

48.     The statutory safe harbor provided for certain forward-looking statements does not apply to any of the false statements alleged in this Complaint.  None of the statements alleged herein are "forward-looking" statements and no such statement was identified as a "forward-looking statement" when made.  Rather, the statements alleged herein to be false and misleading all relate to facts and conditions existing at the time the statements were made.   Moreover, cautionary

statements, if any, did not identify important factors that could cause actual results to differ materially from those in any forward-looking statements.

49.     In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein which is deemed to be forward-looking, the Individual Defendants are liable for such false forward-looking statements because at the time each such statement was made, the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statements were materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of TierOne who actually knew or recklessly disregarded the fact that each such statement was false and/or misleading when made. None of the historic or present tense statements made by the Individual Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Individual Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## LOSS CAUSATION/ECONOMIC LOSS

50.     During the Class Period, the Individual Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated TierOne's stock price and operated as a fraud or deceit on purchasers of TierOne stock by misrepresenting the Company's financial condition and business prospects.  Once the Individual Defendants' misrepresentations and fraudulent conduct were disclosed to the market, TierOne's stock price reacted negatively as the

artificial inflation was removed from it.  As a result of their purchases of TierOne stock during the Class Period, Plaintiff and other members of the Class suffered economic loss.

51.     The Individual Defendants' false and misleading statements had the intended effect and caused TierOne stock to trade at artificially inflated levels throughout the Class Period.

52.     As investors and the market became aware of TierOne's  prior misstatements and omissions and that TierOne's actual financial condition and business prospects were, in fact, not  as represented, TierOne's stock price reacted negatively, damaging investors.

**Applicability of Presumption of Reliance:**
**<u>Fraud-on-the-Market Doctrine</u>**

53.     At all relevant times, the market for TierOne's common stock was an efficient market for the following reasons, among others:

(a)     TierOne's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated markets;

(b)     During the class period, on average over a million shares of TierOne's stock were traded on a weekly basis, demonstrating a very strong presumption of an efficient market;

(c)     As a regulated issuer, TierOne filed with the SEC periodic public reports during the Class Period;

(d)     TierOne regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

      (e)     TierOne was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period.  Each of these reports was publicly available and entered the public marketplace;

      (f)     Numerous NASD member firms were active market-makers in TierOne stock at all times during the Class Period;  and

      (g)     Unexpected material news about TierOne was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

54.    As a result of the foregoing, the market for TierOne's common stock promptly digested current information regarding TierOne from all publicly available sources and reflected such information in TierOne's stock price.  Under these circumstances, all purchasers of TierOne's common stock during the Class Period suffered similar injury through their purchase of TierOne's common stock at artificially inflated prices, and a presumption of reliance applies.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

55.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased the securities of TierOne during the Class Period and who were damaged thereby.  Excluded from the Class are defendants, the current and former officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

56.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, TierOne's securities were actively traded on the

NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class.  Members of the Class may be identified from records maintained by TierOne or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

57.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

58.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether the misstatements and omissions alleged herein were made with scienter;

(c)     whether statements made by the Individual Defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the business, prospects, sales, operations and management of TierOne; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

60.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM

**Violation of Section 10(b) of**
**The Exchange Act Against and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.     This First Claim is asserted against defendants TierOne and the Individual Defendants.

63.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase and/or sell TierOne securities at artificially inflated and distorted prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, individually and as a group, took the actions set forth herein.

64.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of TierOne as specified herein.

65.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of TierOne's value and performance and continued

27

substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about TierOne and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of TierOne's securities during the Class Period.

66.     Each of the Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Defendants were high-level executives,  directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of the Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of the Defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; (4) each of the Defendants was aware of the Company's dissemination  of information to the investing public that they knew or recklessly disregarded was materially false and misleading; and (5) each of the Defendants culpably participated in the wrongful conduct alleged herein.

67.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing TierOne's financial condition and future business prospects from the investing

public and supporting the artificially inflated or distorted price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial condition and business prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

68.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for TierOne's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of TierOne's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired and/or sold TierOne securities during the Class Period at artificially high prices and were damaged thereby.

69.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding TierOne's financial results, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired TierOne securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

29

70.     By virtue of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

71.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

72.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

<u>**SECOND CLAIM**</u>

**Violation of Section 20(a) of**
<u>**The Exchange Act Against the Individual Defendants**</u>

73.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

74.     This Second Claim is asserted against each of the Individual Defendants.

75.     The Individual Defendants acted as controlling persons of TierOne within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's revenues and earnings and dissemination of information to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were

issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

76.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

77.     As set forth above, TierOne violated Section 10(b) and Rule 10b-5.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

78.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: May 20, 2010                              Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**


By:  s/ Christopher S. Hinton
    Christopher S. Hinton

Phillip Kim, Esq.
Laurence M. Rosen, Esq.
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827
chinton@rosenlegal.com
lrosen@rosenlegal.com
pkim@rosenlegal.com

Counsel for Plaintiff

## CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against TierOne Corporation ("TONE") and its current and former officers and directors. The Rosen Law Firm, P.A. agrees to prosecute the action on a contingent fee basis not to exceed one-third of any recovery and will advance all costs and expenses. Any legal fees and expenses will be determined by, and payable, only upon order of the U.S. District Court.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      I have reviewed the complaint against TierOne Corporation and certain of its officers and directors and authorize the filing thereof. I also retain the Rosen Law Firm, P.A. as counsel in this action for all purposes.

2.      I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the purchases and sales I have made in TONE securities during the Class Period set forth in the complaint. I have made no transactions during the class period in the securities that are the subject of this lawsuit except those set forth below.

| Number      of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| *SEE ATTACHED* | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM:  (212) 202-3827

5.     I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.     I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __19__ day of __MAY__, 2010.

REDACTED

Signature: _David G. Ray_
Name: DAVID G. RAY
Address:

Phone:
E-mail:

Item. 4 (continue from prior page if needed)

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| SEE ATTACHED | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827     2
OR MAIL TO:
THE ROSEN LAW FIRM PA
350 FIFTH AVENUE, SUITE 5508
NEW YORK, NY   10118

## Shares Purchased

| | Number of Shares: | Buy Date: | Price Per Share: |
|---|---|---|---|
| transaction: | 35 | 01/11/2008 | 19.40 |
| transaction: | 65 | 01/11/2008 | 19.40 |
| transaction: | 120 | 07/01/2008 | 4.18 |
| transaction: | 100 | 07/07/2008 | 3.67 |
| transaction: | 100 | 07/10/2008 | 3.51 |
| transaction: | 500 | 09/09/2008 | 5.50 |
| transaction: | 252 | 09/30/2008 | 4.95 |
| transaction: | 200 | 11/19/2008 | 3.98 |
| transaction: | 100 | 11/20/2008 | 3.7299 |
| transaction: | 1000 | 06/09/2009 | 2.00 |
| transaction: | 500 | 11/18/2009 | 0.85 |
| transaction: | 1400 | 11/18/2009 | 0.85 |
| transaction: | 600 | 11/18/2009 | 0.85 |

## Shares Sold

| | Number of Shares: | Sell Date: | Price Per Share: |
|---|---|---|---|
| transaction: | 323 | 12/17/2009 | 0.70 |
| transaction: | 649 | 12/22/2009 | 0.71 |
| transaction: | 2000 | 02/23/2010 | 0.65 |
| transaction: | 1800 | 04/09/2010 | 0.35 |